U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

FEB 9  II 31 AM '04

**David A. Perry, (pro se)**

        **vs.**

**Virginia C. Beecher, Director of the
New Hampshire Division of Motor
Vehicles**

CIVIL ACTION NO. *C 04-46-m*

**1st Amended Complaint for:**
- **DECLARATORY JUDGEMENT (28 USC 2201)**
- **DECLARATORY RELIEF (28 USC 2202)**

## COMPLAINT

**By**

**David A. Perry, (pro se)
53 Delaware Ave
Manchester, NH 03104
(603) 682-7832**



# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

    CASE LAW.......................................................................iii

    NEW HAMPSHIRE STATUTES....................................... iv

    NEW HAMPSHIRE ADMINISTRATIVE RULES............ iv

    UNITED STATES CODE.............................................. iv

    UNITED STATES CONSTITUTION.............................. v

INTRODUCTION............................................................................ 1

JURISDICTION.............................................................................. 1

PLAINTIFF.................................................................................... 1

DEFENDANT................................................................................. 2

PROCEDURAL BACKGROUND.................................................... 2

NATURE OF INJURY.................................................................... 5

MERITS OF THE CLAIM.............................................................. 7

    CRIMINAL PUNISHMENT........................................... 7

    DOUBLE JEOPARDY.................................................. 15

    EXCESSIVE PUNISHMENT......................................... 19

    DUE PROCESS AND STANDARD OF PROOF............... 28

RELIEF SOUGHT.......................................................................... 29

CERTIFICATION........................................................................... 31

## TABLE OF AUTHORITIES

**Case Law:**

Alexander v. United States, 509 U.S. 544 (1993) ............................................20,21

Allen v. Attorney General of State of Maine, 80 F.3d 569 (1st Cir. 1996) ............14

Apprendi v. New Jersey (99-478) 530 U.S. 466 (2000) ................................28,29

Aptheker v. Secretary of State, 378 U.S. 500 (1964)........................................6

Austin v. United States, 509 U.S. 602 (1993) ...............................................19,20

Bell v. Burson, 402 U.S. 535 (1971) ................................................................5

Blockburger v. United States, 284 U.S. 299 (1932) ........................................16

Chicago Motor Coach v. Chicago, 169 NE 22 ................................................23

Crandall v. State of Nevada, 73 U.S. 35 (1867).............................................6,7

Ex parte Garland, 71 US (4 Wall) 333, 18 L Ed 366 (1877).................................11

Flemming v. Nestor, 363 US 603 (1960)..........................................................11

Griswold v. Connecticut, 381 U.S. 479 (1965) ...................................................22

Herbert v. Billy (6th Cir. 1998)........................................................................14

Hudson v. United States, 118 S. Ct. 488, 493 (1997) ................................8,10,11

II Am.Jur. (1st) Constitutional Law, Sect.329, p.1135 .......................................23

Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963)................................8,11,20

Kent v. Dulles, 357 U.S. 116 (1958) ...........................................................22,27

Mackey v. Montrym, 443 U.S. 1 (1979) .....................................................5,21,26

Montana v. Kurth Ranch, 511 U.S. 767, 781 (1994)..........................................21

Patricia Johnson; Michael Au France v. City of Cincinnati, 2002 FED App. 0332P (6th Cir.)(Electronic Citation)..................................................................................6

Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965) ....................................29

Report of the Governors Task Force on DWI (1982) .........................................10

Snyder v. Massachusetts, 291 U.S. 97 (1934)....................................................24

Substantive Criminal Law, § 3.2, at 272-73 (1986) by W. LaFave & A. Scott .....18

Thompson v. Smith, 154 SE 179 ....................................................................23

United States v. Dixon, 509 U.S. 688 (1993) .......................................16

United States v. Halper, 490 U.S. 435 (1989)..................................10,19

United States v. Imngren, 98 F.3d 811, 816 (4th Cir. 1996)................................14

United States v. Ward, 448 U.S. 242 (1980)...................................8,11

Wensley v. Director, Division of Motor Vehicles, 140 N.H. 560 (1995) ..............11

## New Hampshire Statutes:

- NH RSA 262:19
- NH RSA 263:59
- NH RSA 263:75 II
- NH RSA 265:54
- NH RSA 265:79
- NH RSA 265:82
- NH RSA 265:82-a
- NH RSA 265:82-b I-IV
- NH RSA 265:82-d
- NH RSA 265:84
- NH RSA 265:87
- NH RSA 265:91
- NH RSA 265:91-a
- NH RSA 265:91-b II
- NH RSA 265:91-c
- NH RSA 265:91-e
- NH RSA 265:92

## New Hampshire Administrative Rules:

- NH Saf-C 203.22(c)
- NH Saf-C 205.04
- NH Saf-C 205.07
- NH Saf-C 206.06(I)
- NH Saf-C 206.07
- NH Saf-C 204.13

## United States Code:

- 28 USC 2201
- 28 USC 2202

## INTRODUCTION

1. This is an individual action for declaratory judgement and declaratory relief, authorized under the Declaratory Judgement Act (28 USC 2201-2202). This action challenges the State of New Hampshire's statutory scheme regarding driver license suspensions for implied-consent violations, and/or the application of this scheme by the New Hampshire Division of Motor Vehicles. In short, the New Hampshire scheme imposes a 6 month or 2 year license suspension for an implied-consent violation that runs consecutive to, and non-concurrent with, a criminal license suspension for the underlying DUI conviction. This action will demonstrate that this driver license suspension is in "form and effect" criminal punishment, that it violates the double-jeopardy protection against multiple punishments, that it violates the excessive punishment clause of the 8th Amendment, and that it violates due process because it imposes "criminal punishment" only after a finding guilt on a "preponderance of the evidence" standard.

## JURISDICTION

2. The Plaintiff has exhausted all state remedies available (See Exhibits A-C). In addition, the Plaintiff and the Defendant both reside within the Federal District of New Hampshire. Therefore, this Court has jurisdiction over this present action under the Declaratory Judgement Act (28 USC 2201-2202).

## PLAINTIFF

3. The Plaintiff resides within the Federal District of New Hampshire. The Plaintiff is currently serving a 2 year implied-consent driver license suspension for conduct that occurred on March 30, 2000. This license suspension will not end until May 30, 2005,

and is in addition to a 3 year DUI driver license suspension already served by the

Plaintiff for the aforementioned conduct of March 30, 2000. Therefore, the Plaintiff has

standing to bring this action. The Plaintiff's contact information is as follows:

> David A. Perry
> 53 Delaware Avenue
> Manchester, NH 03104
> (603) 682-7832

## DEFENDANT

4. The New Hampshire Division of Motor Vehicles is the sole administrative agency

within the State of New Hampshire responsible for granting, revoking, and restoring

driver licenses. Virginia C. Beecher is the Director of the New Hampshire Division of

Motor Vehicles. The Defendant's contact information is as follows:

> Virginia C. Beecher, Director
> New Hampshire Division of Motor Vehicles
> New Hampshire Department of Safety
> 33 Hazen Drive
> Concord, NH 03305

## PROCEDURAL BACKGROUND

5. In the early hours of March 30, 2000 the Plaintiff was brought to the Manchester, NH

Police Department on suspicion of DUI (NH RSA 265:82), and for other unrelated

charges. Much of what happened at the Manchester, NH Police Department is

disputed, but left undisputed is the fact that Officer Nathan Boudreau deemed the

Plaintiff as being a *refusal* under the implied-consent statute of NH RSA 265:91. In

addition, the Plaintiff was formally charged with DUI 2nd Offense (NH RSA 265:82),

along with a number of other charges. A few days later the Plaintiff received notice from

the New Hampshire Division of Motor Vehicles that his license would be suspended for

2

2 years for being in violation of NH RSA 265:91.  Upon request by the Plaintiff, a

hearing was scheduled for May 4, 2000.  The Hearings Examiner ruled against the

Plaintiff on the standard of the "preponderance of evidence".

6. The Plaintiff, who still had 2 previous criminal matters pending in Hillsborough County

Superior Court, had the criminal charges resulting from the March 30, 2000 arrest

transferred from the Manchester, NH District Court to the Hillsborough County Superior

Court. This transfer was made without objection, and with the full cooperation of the

Manchester, NH City Solicitor's Office.  After all the legal transfer work was complete,

the Plaintiff entered into a plea agreement on August 4, 2000 for all outstanding

charges. The Plaintiff pled guilty to the aforementioned March 30, 2000 DUI 2nd

Offense, and to the other unrelated criminal charges.  As part of the criminal sentence,

the Plaintiff lost his driving privileges until 3 years from the date of the offense (March

30, 2003).  The Defendant was notified of the motor vehicle convictions shortly

thereafter, in accordance with New Hampshire reporting requirements.

7. The Plaintiff subsequently appealed the findings of fact of the ALS Hearings

Examiner to the Hillsborough County Superior Court under NH RSA 263:75, which

upheld the Hearing Examiner's decision.  The Plaintiff then appealed the findings of fact

to the New Hampshire Supreme Court, which declined the appeal on May 3, 2001.

8. As a result of the criminal conduct of March 30, 2000, and other prior convictions, the

Plaintiff was certified as a habitual offender (under NH RSA 262:19) on November 7,

2000 with the right to request review on or after November 7, 2002.  The Plaintiff has

served all other license suspensions, completed all required mandates under NH RSA

3

265:82-d, and was decertified as a habitual offender on May 30, 2003. The De-certification Hearings Examiner noted at the end of his decision that the Plaintiff still needed to serve the two-year implied-consent suspension before the Plaintiff's license could be restored (Not before May 30, 2005).

9. Subsequently (due to the imposition of the implied-consent suspension, but not in response to the De-certification Hearings Examiner), the Plaintiff filed a Petition for Writ of Habeas Corpus, Mandamus, or Other Alternative Relief in Merrimack County Superior Court (Case 03-E-0210), claiming that NH RSA 265:92 II unconstitutionally transformed the two-year implied-consent suspension into an unconstitutional penalty, and requesting appropriate relief. By Order of August 12, 2003 Judge Fitzgerald III granted the Defendant's (the New Hampshire Division of Motor Vehicles) Motion to Dismiss, without ruling on the merits of the claim. On September 9, 2003 Justice Fitzgerald III issued an Order denying the Plaintiff's Motion for Reconsideration.

10. Finally, the Plaintiff filed a Petition for Original Jurisdiction with the New Hampshire Supreme Court on October 9, 2003. On 11/24/2003 the New Hampshire Supreme Court ruled to consider the filing as an appeal of the 8/12/2003 Order of the Merrimack County Superior Court. However, it voted to decline to accept the appeal, without ruling on the merits of it. The Plaintiff's Motion for Reconsideration was denied in an Order of 1/16/2004. Since the Plaintiff has now exhausted all New Hampshire State remedies, this Complaint now follows.

## NATURE OF INJURY

11. The Plaintiff is suffering from real and present injury of an unconstitutional two-year drivers license suspension for, and only for, the aforementioned implied-consent violation of 3/30/2000. The license suspension was imposed on May 30, 2003 and will not be lifted until 5/30/2005. The Plaintiff is unable to legally operate a motor vehicle on any public way within the State of New Hampshire. In addition, due to the provisions of the Interstate Drivers Compact, the Plaintiff is unable to legally operate a motor vehicle on any public way within the entire United States.

13. The Plaintiff is clearly suffering the loss of a substantial and legally protected monetary interest. (See Mackey v. Montrym, 443 U.S. 1 (1979) – ", "Suspension of a driver's license for statutorily defined cause implicates a property interest protected by the Due Process Clause.") Although the Plaintiff received partial due process through the administrative hearing and appeal process, this process explicitly excluded the possibility of being able to collaterally challenge whether the suspension was appropriate given the Plaintiff's later guilty plea to the underlying DUI charge. (See NH RSA 265:91-b, NH RSA 265:91-d, NH RSA 263:75) (Also see Bell v. Burson, 402 U.S. 535 (1971) where the Supreme Court recognized that "Once licenses are issued, as is in the petitioner's case, their continued possession may become essential in the pursuit of a livelihood", and forced Georgia to determine whether a license suspension was appropriate given the circumstances of liability in an accident.)

13. Furthermore, the Plaintiff contends this license suspension is an unconstitutional restraint on the Plaintiff's fundamental right to travel.

We noted in <u>Kent v. Dulles</u>, 357 U.S. 116, 126 , that "freedom of movement," both internally and abroad, is "deeply engrained" in our history....Free movement by the citizen is of course as dangerous to a tyrant as free expression of ideas or the right of assembly and it is therefore controlled in most countries in the interests of security. That is why riding boxcars carries extreme penalties in Communist lands. That is why the ticketing of people and the use of identification papers are routine matters under totalitarian regimes, yet abhorrent in the United States....Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society.

(<u>Aptheker v. Secretary of State</u>, 378 U.S. 500 (1964))

In addition to the right to travel abroad and between states, the right to intra-state travel was recently recognized by the 6th Circuit Court of Appeals.

In view of the historical endorsement of a right to intrastate travel and the practical necessity of such a right, we hold that the Constitution protects a right to travel locally through public spaces and roadways.

(<u>Patricia Johnson; Michael Au France v. City of Cincinnati</u>,
2002 FED App. 0332P (6th Cir.)(Electronic Citation))

It should be noted that the 6th Circuit Court applied strict judicial scrutiny in striking down Cincinnati's "Over the Rhine" Drug Free Zone, and that cert. was recently denied in this case by the United States Supreme Court.

14. While it is true that the license suspension does not prohibit the Plaintiff from travelling to any particular destination, it nevertheless restricts the modes of travel in which the Plaintiff can exercise his right to travel. In a very real and practical sense it makes travelling to some destinations at least inconvenient, and to others nearly impossible. The Plaintiff contends that modes of travel are fundamental elements of the right to travel. If the State can unduly regulate any mode of travel then the right to travel itself is diminished. (For precedent see <u>Crandall v. State of Nevada</u>, 73 U.S. 35 (1867) where a tax for passing through or leaving the state was unconstitutional, even though it

6

only applied to the travel modes of train and stage coach, and not to other modes of travel, such as walking or riding a horse) While case law may be somewhat silent on the modes of travel, this Court should compare the modes of travel to the modes of free speech. A person may not have an absolute right to free speech through the mode of television. However, should the person have the means, they have the right to express their free speech through television, newspapers, religious tracts, or any number of modes of communication, without undue restriction by the State which does not directly uphold an overriding public interest. The State can not say "We don't like you, shout your free speech from the street corner." Likewise, while the right to drive may be a privilege, it is not a "mere privilege" that can be taken away at the whim of the State. The overriding interest of public safety (or some other legitimate overriding public interest) must be the driving force behind a civil drivers license suspension. The Plaintiff contends that at least intermediate, if not strict, judicial scrutiny must be used to determine if the license suspension is the least restrictive means available in order to fulfill the goals of the overriding public interest in public safety. The Plaintiff contends, and will demonstrate, that this license suspension (imposed over three years after the implied-consent violation occurred) does not fulfill any rational goal of public safety, and that it is certainly not the least restrictive or effective means of fulfilling any overriding public interest.

## MERITS OF THE CLAIM

### Criminal Punishment:

15. For purposes of the Plaintiff's double jeopardy and due process claims (but not the Plaintiff's excessive penalties claim), it is essential to first demonstrate that the license

7

suspension is equivalent to criminal punishment. To this end, we shall follow the United

States Supreme Court's logic in Hudson v. United States, 522 U.S. 93 (1997)

(Reaffirming pre-Halper analysis embodied in United States v. Ward, 448 U.S. 242

(1980) and Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963)).

16. The first step is to determine whether the New Hampshire legislature, "in

establishing the penalizing mechanism, indicated either expressly or impliedly a

preference for one label or the other.", United States v. Ward, 448 U.S. 242 (1980), at

248. The Plaintiff concedes that the New Hampshire legislature clearly established the

implied-consent penalizing mechanism as civil, rather than criminal. However, the

Plaintiff contends that the legislature was merely attempting to create a criminal

punishment in "civil disguise", in order to skirt issues of double jeopardy. Therefore, it is

useful to look at the legislative history behind New Hampshire's implied-consent

statutory scheme.

17. There is no doubt that the State of New Hampshire has a legitimate public interest in

keeping the roads of New Hampshire safe from the dangers of drunk drivers. To this

end, the legislature has established the DUI laws contained in NH RSA 265:82. On the

other hand, the implied consent statutes contained in NH RSA 265:91 serve no

legitimate public interest directly. There is obviously no direct legitimate public interest

in whether a person submits to a test for blood-alcohol content, or in the results of such

a test. Rather, the public interest in the statutes of NH RSA 265:91 is in supporting the

enforcement and prosecution of the DUI laws contained in NH RSA 265:82. This not to

say that the supportive role of the implied consent laws found in NH RSA 265:91,

8

makes the penalties imposed for its violation (NH RSA 265:91-a and NH RSA 265:92) a punishment. However, once a person either pleads guilty, or is found guilty of a DUI offense under NH RSA 265:82, the public interest has been already been met. That person have necessarily lost their license for a period of time, and will be required to demonstrate reform by completing the mandates of NH RSA 265:82-d before their license will be restored to them.

18. Prior to 1983, a license suspension for an implied-consent violation ran concurrently with other license suspensions. As a result of the increasing number of alcohol related motor vehicle fatalities, the NH House in 1983 introduced HB 45, which was a major reform of all DUI related statutes. At the same time a similar set of bills were introduced by the NH Senate, SB 7 and SB 28, which were eventually merged together into SB 28. After extensive research of the House and Senate Journals, as well as appropriate documentation from the House and Senate committees, the Plaintiff concedes that it is difficult to discern the legislative intent behind making the penalties for refusal run successively, as opposed to its previous concurrent implementation. There was a great outcry that the penalties for refusal should be increased from the prior 60-day suspension, but nothing specific is to be found on the exact issue of concurrency.

19. However, we can discern intent based on source materials that were used in drawing up the legislation. State Senator Champlain sponsored SB 28 in the NH Senate. He unequivocally equates SB 28 to be exactly equivalent to HB 45, when he recommends HB 45's passage. In addition, he earlier recommends SB 28 because it is based on the Governor's Task Force on DWI. Therefore, the recommendations of the

9

1982 Governor's Task Force on DWI, is a primary source of legislative intent. A fair reading of the Task Force's report demonstrates that they were concerned with DUI convictions. They recommend increasing the penalties for implied-consent violations in order to secure more DUI convictions, and not necessarily to protect the public:

> While the police can and do successfully obtain convictions in court without having the results of a chemical test, it makes their job more difficult, and the defendant has a better chance of avoiding a guilty finding. ... The Task Force believes the implied consent law ought to be amended so as to make the refusal to take the test less attractive.
> (Report of the Governors Task Force on DWI (1982), p.10)

The 1982 Governor's Task Force on DWI was formed by then Governor Hugh Gallen, to respond to the increasing number of alcohol related fatalities in New Hampshire. At that time DUI convictions were hard to come by, and even less prevalent when the person refused to take an alcohol concentration test. A fair reading of the entire report will show that the intent of changing the implied consent statutes was not primarily to keep drivers, who refused a test, off the road as quickly as possible, but rather to provide evidence to secure more DUI convictions. In short, the primary intent of the Task Force's recommendations, was *retribution* and *deterrence*; the primary characteristics of punishment. In these times, before United States v. Halper, 490 U.S. 435 (1989), the Task Force and the NH Legislature apparently thought nothing of imposing civil punishment.

20. Regardless of the intent of the New Hampshire legislature, we still must determine whether the implied-consent suspension penalty is in "form and effect" criminal punishment. To that aid in that determination, we look to the factors espoused by the United States Supreme Court in Hudson v. United States, 522 U.S. 93 (1997):

> In making this latter determination, the factors listed in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168 -169 (1963), provide useful guideposts, including: (1) "[w]hether the

sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of scienter "; (4) "whether its operation will promote the traditional aims of punishment-retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

(Hudson v. United States, 522 U.S. 93 (1997))

We look to these factors, not as an absolute checklist, but as helpful guideposts (See

United States v. Ward, 448. U.S. 242 (1980) – "This list of considerations, while

certainly neither exhaustive nor dispositive, has proved helpful in our own consideration

of similar questions, see, e. g., Bell v. Wolfish, 441 U.S. 520, 537 -538 (1979), and

provides some guidance in the present case.").

21. We then consider New Hampshire's implied-consent penalty (NH RSA 265:92) in

light of these 7 factors:

(1) While the United States Supreme Court has not been exactly clear on what actions constitute an affirmative restraint, actions that restrain fundamental liberty interests have generally considered to be potential "affirmative restraints". (See e.g. – Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963) – deportation and denial of passports, Flemming v. Nestor, 363 US 603 (1960) – denial of social security benefits, Ex parte Garland, 71 US (4 Wall) 333, 18 L Ed 366 (1877) – exclusion from practice of law) The "right to travel" is fundamental, and a two-year complete ban on operating a motor vehicle qualifies as an affirmative restraint on a fundamental liberty interest.

(2) While civil license forfeiture can be said to generally serve the public interest of protecting the highways and roads of New Hampshire, it nonetheless has historically been considered punishment. The mandatory length of the civil license forfeiture, regardless of any showing that the person may be unlikely to recidivate, strengthens this point. (For more information, see the section related to Excessive Punishment later in this Complaint)

(3) The penalties of NH RSA 265:92 II only come into play on a finding of scienter. By statute, the consent of NH RSA 265:91 is implied. Only by specific intention can the statute be violated. The New Hampshire Supreme Court has recognized this:

> In light of the serious consequences of refusing a BAC test, see RSA 265:92, in this case a two-year license suspension, a refusal should not be inferred unless an arrestee manifests a decision not to cooperate.
> (Wensley v. Director, Division of Motor Vehicles, 140 N.H. 560 (1995))

(4) The penalties here most certainly promote the traditional aims of punishment: deterrence and retribution. It is the clear message of the statute that it wants to deter *refusal* under NH RSA 265:91, and seek retribution on its violators, by making the penalty extreme, non-concurrent, and mandatory.

(5) The behavior that NH RSA 265:91, and its penalties under NH RSA 265:92, apply directly and only to DUI infractions under NH RSA 265:82. If there are not reasonable grounds for a DUI arrest, any "refusal" thereafter is not a violation of NH RSA 265:91. DUI laws are already crimes.

(6) There are only two alternative purposes, besides retribution and deterrence. The first is public safety. The other is to compensate the State for having a harder time in prosecuting its case for DUI.

(7) The penalty imposed for these alternate purposes does seem excessive, at least in cases where the violator has pled or been found guilty of the underlying NH RSA 265:82 charge. If the license suspension ran from the time, or from close to the time, of the actual implied-consent violation, then public safety might be served. As it is, (due to NH RSA 265:92 II) the license suspension has not been imposed until 38 months after the actual implied-consent violation. Public safety can not reasonably be said to be served when the Plaintiff has already served a lengthy 3-year suspension for essentially the same conduct. Furthermore, NH RSA 265:82-d already provides safeguards to ensure that individual has indeed reformed prior to having their drivers license restored. As far as compensation for State prosecution; if the violator of NH RSA 265:91 has pled guilty before trial on the DUI charge (as it is in the case of the Plaintiff), no large burden has been placed on the prosecutor. Even in the case where the prosecutor has spent extra time and money to secure a guilty finding in the DUI charge, the penalty is still excessive. Some sort of fine, in both cases, is probably more in line with this alternate purpose. (For more information see the section related to Excessive Punishment later in this Complaint)

22. Furthermore, this Court should consider the fact that the State of New Hampshire

has provided no vehicle to determine whether it is appropriate, or in the interests of

public safety, to impose this license suspension over three years from the time of the

incident. If there were any real remedial value to this penalty being imposed at this

time, then it should be demonstrated that the Plaintiff is a risk to public safety at this

time. The fact is that individuals convicted of DUI must already pass a series of

safeguards to demonstrate that they are not a risk to recidivate before their drivers

licenses are restored. NH RSA 265:82-d requires that an individual pay all fines and

fees, serve all license suspensions, successfully complete an alcohol treatment program, and completed any mandated aftercare counseling treatment, before their license is restored. (A favorable alcohol diagnosis, dated no earlier than 6 months prior to restoration, must be on file with the Division of Motor Vehicles before the license is restored). Furthermore, the Division of Motor Vehicles can administratively suspend an individual's license for longer if there is evidence that the individual is a person hazardous to public safety (See NH RSA 263:59 and NH Saf-C 204.13). The Plaintiff has indeed served a lengthy 3 year license suspension, paid all Court fines, completed and paid for the Multiple Offender Program, successfully completed 9 months of alcohol counseling, and has had no further trouble with the law since 3/30/2000. In short, there is no evidence that the Plaintiff is a risk to public safety. Therefore this lengthy two-year license suspension does not in any way serve the overriding public interest in public safety.

23. It might be argued that a person who has violated implied-consent under NH RSA 265:91, and who is nonetheless "guilty" of DUI, under NH RSA 265:82, still may have eluded the justice of an aggravated DUI conviction under NH RSA 265:82-a. It would then be argued that the additional implied-consent license suspension period acts as a remedial civil sanction that protects the public from irresponsible drivers who may have not yet reformed. This argument is misplaced for a couple of reasons. First, the Plaintiff pled "guilty" to a DUI – 2nd Offense. The license suspension period for DUI – 2nd Offense is three years. It is the same length, regardless of whether the individual was found guilty of NH RSA 265:82 or NH RSA 265:82-a. Short of an accident resulting in serious bodily harm (which is not the applicable to the Plaintiff), the only difference in

13

penalties is an increased fine. (See NH RSA 265:82-b) The New Hampshire legislature surely envisioned that a three-year loss of license was sufficient for reformation, if the person also completed any mandated treatment plans (i.e. – The Multiple Offender Program, and all of its aftercare requirements), even if the individual was guilty of an aggravated DUI offense. To replace an increase in fines, with a two-year loss of license is an excessive penalty to anything the Plaintiff may have eluded. Finally, if there are holes in the criminal code, they should not be "patched" by the way of additional mandatory civil license suspensions. The way to fix deficient criminal code is to build better criminal code. The New Hampshire legislature could easily, if they wished, include individuals who have violated implied-consent in the terminology of NH RSA 265:82-a. In short, an implied-consent suspension applied successively to a DUI suspension, is certainly not the least restrictive means available for ensuring public safety. Again, the Plaintiff has a fundamental right to travel, and the imposition of the implied-consent suspension, over 3 years from the date of the incident, restricts that right unnecessarily.

24. Finally, it might be argued that federal courts have already ruled that implied-consent license suspensions are not criminal punishment (See Allen v. Attorney General of State of Maine, 80 F.3d 569 (1st Cir. 1996), United States v. Imngren, 98 F.3d 811, 816 (4th Cir. 1996), Herbert v. Billy (6th Cir. 1998)). However, federal courts have not ruled on the constitutionality of the State of New Hampshire's implied-consent statutory scheme. In all cases, the Federal courts ruled on implied-consent license suspensions that ran from, or close to, the date of the incident, and ran concurrently with potential criminal DUI license suspensions for the same conduct. In those cases it

could be fairly construed that the civil license suspension at least partially fulfilled the legitimate public interest in public safety, and therefore was not criminal punishment. However, the Plaintiff contends that the very nature of WHEN the New Hampshire suspension is imposed, directly affects the nature of the penalty itself. The real reason for the implied-consent license suspension is not because the refusal is in itself detrimental to the public safety. Rather, the real reason behind the license suspension is that the refusal indicates (even if it can not be proven in a criminal court of law) that the individual was most likely operating a motor vehicle while under the influence of alcohol. This rationale is legitimate if the State imposes the license suspension right away. However, the rationale is invalid when the license suspension is imposed after the individual has already served a DUI license suspension, and necessarily taken steps to demonstrate that they are not a risk to public safety. In short, the New Hampshire scheme is qualitatively distinct from any of those in which federal courts have ruled on to date.

25. In conclusion, it is clear that New Hampshire's implied-consent suspension is a non-remedial penalty whose main characteristics are "retribution" and "deterrence", especially when it is imposed after a DUI license suspension for the same conduct. Therefore the license suspension is in "form and effect" criminal punishment.

## Double Jeopardy:

26. The Plaintiff contends that imposition of the 2-year implied-consent suspension on May 30, 2003, violates the 5th Amendment protection against multiple punishments for the same offense. The Plaintiff contends that he has already been convicted and



punished for DUI, and that this DUI is, in some sense, a lesser-included offense of the implied-consent violation.

27. To determine whether a DUI conviction is a lesser-included offense of an implied-consent violation, we turn to the traditional "same elements" test (See Blockburger v. United States, 284 U.S. 299 (1932) ). The test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' within the Clause's meaning, and double jeopardy bars subsequent punishment or prosecution." (United States v. Dixon, 509 U.S. 688 (1993)). It should be noted that the Court recognizes that "subsequent punishment" is also barred by double jeopardy. It is unimportant that the implied-consent "prosecution" happened before the DUI prosecution. It only matters that the implied-consent punishment is subsequent to the DUI punishment.

28. The elements that must be proved for DUI under NH RSA 265:82 are:

1) That person was in physical control of a motor vehicle on a public way of New Hampshire,

2) That the person, while doing so, was under the influence of intoxicating liquor or drugs.

The elements that must be proved for an implied-consent violation (See NH RSA 265:84, 265:87, 265:91-b II) are:

1) That the officer had reasonable grounds to believe that the person was in physical control of a motor vehicle on a public way of New Hampshire,

2) That the officer had reasonable grounds to believe that the person, while doing so, was under the influence of intoxicating liquor or drugs,

3) That the person was arrested, and

4) That, after the pre-requisites of NH RSA 265:87 are complete (that the person was informed of their rights and obligations in regards to implied-consent), the person refuses to submit to the request for an alcohol concentration test.

It is plain that the elements of DUI (1-2) are a whole and complete subset of the elements of implied-consent (1-4). DUI does not contain an element that is not included in implied-consent, and therefore the imposition of the implied-consent suspension violates the double jeopardy protection against multiple punishments for the same offense.

29. Now one may argue that the elements are different, because in the case of DUI one must prove the elements actually occurred, where in the implied-consent violation one must only prove that the officer had reasonable grounds that the elements had occurred. However, this argument misses the point that the same "course of conduct" must be proved, and that the only difference is the matter of degree of certainty that the elements must be proved. The Plaintiff concedes that additional actual evidence will be available against the person accused of DUI. The evidence of refusal, post-refusal testimony and confessions, and any other post-refusal evidence found, can be used against the person accused of DUI. The argument would proceed, that since additional evidence is available on the DUI elements of driving and intoxication, that those two elements of DUI are not the same as their implied-consent violation counterparts. This, however, is missing the point. While a difference in the nature of evidence sometimes is indicative of a difference in the elements, we are here talking about the quantity of evidence, and not the nature of it, or what it points to.

17

30. It also might be argued that the DUI elements are qualitatively different from their implied-consent counterparts due to the fact the officer's reasonable grounds only have to be proved reasonable for the time leading up to the implied-consent violation. They would argue that certain exculpatory evidence might be found later that would prove that the person was not in actual control of a vehicle on a public way of New Hampshire and/or that when doing so they were in actuality under the influence of intoxicating liquor or drugs. So, as the argument goes, one would still be guilty of the implied-consent violation, even though the elemental evidence of DUI would not be proved. This argument also misses the point. If such exculpatory evidence did exist, and it was of sufficient quality to disprove the DUI elements, a person could not legally be found guilty of DUI beyond a reasonable doubt. In such as case, double jeopardy would not even be applicable. The Plaintiff is not arguing that double jeopardy always applies to the penalties of NH RSA 265:92, but only that it applies when a person also pleads, or is found guilty of DUI.

31. Finally, It might next be argued that the DUI and implied-consent violation are two different "criminal acts". Therefore, the common elements test, as stated above, does not apply. They would argue that the DUI happened first, and then only later, after arrest, did the person commit the second "criminal act" of refusing to take a chemical test for alcohol concentration. However, a criminal "act" consists of the sum of discrete actions that together constitute an offense. (See W. LaFave & A. Scott, <u>Substantive Criminal Law</u> § 3.2, at 272-73 (1986)). As explained above, the implied-consent violation requires that at least reasonable grounds exist that the person had been driving on a public way, and that in doing so was under the influence of intoxicating

18

liquor, or drugs. In other words, it requires a degree of proof of the prior predicate

*course of conduct*. A refusal to take an alcohol concentration test, without that prior

predicate *course of conduct*, is not a crime or offense of any sort. Therefore it is a legal

impossibility for the two offenses to be considered different "criminal acts."

32. In conclusion, the Plaintiff has already served a 3-year license suspension for DUI.

The imposition of an additional 2-year implied-consent license suspension for the same

conduct, is "criminal punishment" that is in violation of double jeopardy and the 5th

Amendment of the United States Constitution.

### Excessive Punishment:

33. With the coming of United States v. Halper, 490 U.S. 435 (1989) the US Supreme

Court began bringing down the strict demarcation of criminal and civil punishment:

> The notion of punishment, as we commonly understand it, cuts across the division
> between the civil and the criminal law, and for the purposes of assessing whether a
> given sanction constitutes multiple punishment barred by the Double Jeopardy Clause,
> we must follow the notion where it leads.
>
> (United States v. Halper, 490 U.S. 435 (1989))

Of course, Halper was specifically looking at punishment in relation to the "Double

Jeopardy" clause, but its principle would be picked up on, as we shall see. (Note –

Halper may be disavowed by Hudson for "double jeopardy" analysis, but there is

nothing to indicate that such a disavowal applies to 8th Amendment analysis, or to its

general principles)

34. The US Supreme Court first applied Halper's principles to the 8th Amendment in

Austin v. United States, 509 U.S. 602 (1993). The Austin Court specifically disavows

the stringent test for "punishment" that is laid out in <u>Kennedy v. Mendoza-Martinez</u>, 372

U.S. 144 (1963), which was the basis for the earlier mentioned Hudson test, for

purposes of 8th Amendment analysis.  On the other hand, the Court positively affirms

that the 8th Amendment is not specifically limited to criminal punishment.  The Court

then went on to review the history of civil forfeitures to show that such forfeitures had

historically been considered punishment, at least in part.  It therefore concluded that

civil forfeitures could be considered punishment for 8th Amendment analysis if the

forfeiture's purpose was not solely remedial:

> In light of the historical understanding of forfeiture as punishment, the clear focus of
> 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress
> understood those provisions as serving to deter and to punish, we cannot conclude that
> forfeiture under 881(a)(4) and (a)(7) serves solely a remedial purpose. <u>14</u> We therefore
> conclude that forfeiture under these provisions constitutes "payment to a sovereign as
> punishment for some offense," <u>Browning-Ferris</u>, 492 U.S., at 265, and, as such, is
> subject to the limitations of the Eighth Amendment's Excessive Fines Clause.
> (<u>Austin v. United States</u>, 509 U.S. 602 (1993))

Therefore, a new two-part standard is set in determining whether a civil sanction is

punishment for 8th Amendment analysis is apparent: 1) Has the civil sanction historically

been regarded as at least partially punitive? 2) Is the civil sanction totally remedial in

purpose?

35. We now must explore whether license suspension has historically been considered

partially punitive.  In Austin the Court was looking at the history of *in rem* forfeiture of

property.  On the same day as Austin, the US Supreme Court also held in <u>Alexander v.</u>

<u>United States</u>, 509 U.S. 544 (1993) that monetary penalties based solely on criminal

guilt are punishment:

> The in personam criminal forfeiture at issue here is clearly a form of monetary
> punishment no different, for Eighth Amendment purposes, from a traditional "fine."
> Accord, Austin, supra. 4 Accordingly, the forfeiture in this case should be analyzed under
> the Excessive Fines Clause.
>
> (Alexander v. United States, 509 U.S. 544 (1993))

And although, not specifically cited under 8th Amendment analysis, a civil tax based

solely on criminal guilt would also be considered punishment under 8th Amendment

analysis (See Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 781

(1994) ).  Unfortunately, recent federal case law has not explored the history of civil

license suspension penalties in regards to 8th Amendment analysis.  Should we then, for

purposes of historical analysis, consider license suspension a form of civil property

forfeiture?  In some regards it is considered a property interest, especially in Due

Process considerations (See Mackey v. Montrym, 443 U.S. 1 (1979)).  The Plaintiff

thinks not.  Although license forfeiture certainly has a profound monetary effect, and is

in itself indicative of a punitive and non-remedial effect, that effect can not quantified

easily.  Rather, we should embark on a new class of historical analysis on the civil

sanction of the suspension of driving rights.  This is allowable, since Austin has opened

the entire set of civil sanctions to 8th Amendment analysis.

> Criminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They
> generate government revenues, impose fiscal burdens on individuals, and deter certain
> behavior. All of these sanctions are subject to constitutional constraints.
>
> (Montana v. Kurth Ranch, 511 U.S. 767, 781 (1994))

We shall then proceed with that historical analysis.

36. Unlike the Austin historical analysis, a look at the pre-constitutional history of these

types of sanctions is not 100 percent on point.  Driving an automobile or motor vehicle

was inapplicable in those days, since those modes of transportation had not yet been

invented.  However, it should be noted that freedom of movement was implied in the

constitution as a prenumbral right under the 9th Amendment of the US Constitution.

Former US Supreme Court Justice Douglas ably defines a prenumbral right:

> Rather, the Ninth Amendment shows a belief of the Constitution's authors that
> fundamental rights exist that are not expressly enumerated in the first eight amendments
> and an intent that the list of rights included there not be deemed exhaustive.
>
> (Griswold v. Connecticut, 381 U.S. 479 (1965))

Further proof of the right to travel's prenumbral nature was recognized by the

United States Supreme Court in Kent v. Dulles, 357 U.S. 116 (1958):

> The right to travel is a part of the "liberty" of which the citizen cannot be
> deprived without due process of law under the Fifth Amendment. So much is conceded
> by the Solicitor General. In Anglo-Saxon law, that right was emerging at least as early as
> the Magna Carta. [n12] Chafee, [p*126] Three Human Rights in the Constitution of 1787
> (1956), 171-181, 187 et seq., shows how deeply engrained in our history this freedom of
> movement is. Freedom of movement across frontiers in either direction, and inside
> frontiers as well, was a part of our heritage. Travel abroad, like travel within the country,
> may be necessary for a livelihood. It may be as close to the heart of the individual as the
> choice of what he eats, or wears, or reads. Freedom of movement is basic in our
> scheme of values.
>
> (Kent v. Dulles, 357 U.S. 116 (1958))

During colonial and revolutionary times (and even to this day), it was considered a

"right" and not a "privilege" to travel via horse drawn carriage over public roads.

Certainly one could have been fined or otherwise punished for excessive speed or

unsafe operation of the horse drawn carriage.  But these fines and penalties were

indeed considered punishments for offenses against the state.


37. When automobiles first began appearing there were no drivers licenses.  That is not

to say that local governing bodies did not regulate their use by creating laws and

regulations.  A variety of laws were passed, which could result in penalties and/or a

prison term. Slowly, license requirements from particular cities throughout the United

States began to take hold. Eventually these were consolidated into State drivers

license requirements, as there was a need for states to uniformly enforce a uniform set

of driving regulations. But, it is quite evident, from a plethora of sources, that safe

driving has been usually considered a "right" and not a "privilege", and not something

that could idly be taken away from a person without due process of law:

> The Right of the Citizen to travel upon the public highways and to transport his property
> thereon, by horsedrawn carriage, wagon, or automobile, is not a mere privilege which
> may be permitted or prohibited at will, but the common Right which he has under his
> Right to life, liberty, and the pursuit of happiness.
> > (II Am.Jur. (1st) Constitutional Law, Sect.329, p.1135)

> Even the legislature has no power to deny to a citizen the right to travel upon the
> highway and transport his property in the ordinary course of his business or pleasure,
> though this right may be regulated in accordance with the public interest and
> convenience.
> > (Chicago Motor Coach v. Chicago, 169 NE 22)

> The right of the citizen to travel upon the public highways and to transport his property
> thereon, either by carriage or by automobile, is not a mere privilege which a city may
> prohibit at will, but a common right which he has under the right to life, liberty, and the
> pursuit of happiness.
> > (Thompson v. Smith, 154 SE 179)

The Plaintiff is not arguing whether driving a motor vehicle should be considered a

"privilege" or a "right", only that from a historical perspective, safe driving has been

considered a "right". The driving right could, of course, be taken away. But as in the

case of any right that is being taken away, it was considered, at least partially punitive,

and therefore meets the first prong of the Austin test.

38. Now we move to the second part of the Austin test, that is, to determine whether

license suspension under NH RSA 265:92 II is totally remedial in nature. A quick look

back at our previous discussion under the "double jeopardy" analysis, will answer this

question with a resounding "No". License suspension under this statute surely has the

punitive qualities of retribution and deterrence, and the subsequent nature of the

penalties under this statute lessen any "public interest" or "remedial" purposes that may

be inherent in NH RSA 265:91 in general. Of course, for one so desperately inclined to

maintain the status quo, it would be easy to quickly label this license suspension as

"totally remedial" from some sort of maxim like "a privilege retracted can never be

punitive". This would be to ignore the obvious. Supreme Court Justice Cardozo long

ago warned us of what he called the "tyranny of labels":

> A fertile source of perversion in constitutional theory is the tyranny of labels. Out of the
> vague precepts of the Fourteenth Amendment a court frames a rule which is general in
> form, though it has been wrought under the pressure of particular situations. Forthwith
> another situation is placed under the rule because it is fitted to the words, though related
> faintly, if at all, to the reasons that brought the rule into existence.
> (Snyder v. Massachusetts, 291 U.S. 97 (1934))

Whether a license is considered a "privilege" or a "right" is a matter that can be

disputed. Whether there exist punitive effects (in freedom of movement, in business

opportunities, and in pursuing happiness) when a license is suspended under NH RSA

265:92 II, is a matter in which there can be no dispute. There are. Therefore, the

license suspension under this statute, has met the Austin test, and has qualified to be

analyzed under the "proportionality" and "excessive fines" clauses of the United States

Constitution.

39. From all that has been said thus far, it should be easy to tell that the consecutive

punishment of NH RSA 265:92 II is excessive, disproportional, and violates the US

Constitution. However, we will take a few brief paragraphs in order to summarize the

ways in which the punishment is excessive. We will show that the punishment is:

1) Excessive in relation to the actual harm caused to the public good;

2) Excessive in relation to the penalties given out in the vast majority of other jurisdictions for the same conduct;

3) Excessive and disproportionate to other administrative penalties given out for more serious violations of New Hampshire's motor vehicle code; and

4) Excessive in relation to the proper amount of regulation allowed against an individual's expression of their fundamental right to travel.

40. As mentioned previously, there is no direct public interest in whether a citizen agrees to take a blood-alcohol concentration test. Its only interest is seeing such a test performed is to enforce DUI statutes. In the case of where a person pleads, or is found guilty of DUI, those statutes have been enforced, and the person has already received punishment that is commensurate with their crime. The only thing the person may have avoided is an aggravated DUI conviction. However, since the license loss period for DUI and aggravated DUI is the same for DUI second offense, an additional license suspension of two years, is excessive to what may have been eluded, had the person taken the test, and been convicted of aggravated DUI. An additional fine, and/or additional jail time, would be more in line with what is reasonable. Finally, there is no scientific evidence to point to that can show that a person, who is guilty of DUI <u>and</u> an implied consent violation, is any more dangerous to the public safety than a person solely convicted of DUI.

41. The Plaintiff realizes that New Hampshire legislature is in no way limited by the punishments given out by other jurisdictions. However, the vast majority of other jurisdictions run implied-consent suspensions concurrent with DUI and other license

suspensions. This should indicate, but not prove, that New Hampshire's law is excessive.

42. The penalties of NH RSA 265:92 II are also excessive in relation to the penalties given for more serious violations of the motor vehicle code. In short, there are far more dangerous things that a driver can be convicted of, in addition to being convicted of DUI. Here are a couple of examples:

1) A person guilty of a third offense of passing a school bus on the right (Under NH RSA 265:54) will lose their license for 120 days. This offense seriously endangers the safety of children, but if the person was also convicted of DUI, the 120 day suspension would run concurrently with the DUI suspension;

2) A person guilty of a second offense of Reckless Driving (Under NH RSA 265:79) could drive at extremely excessive speeds, swerve through traffic, and seriously endanger the lives of the public at large. However, the maximum 1 year license suspension can run concurrently with a DUI license suspension;

These examples are not given to diminish the importance of the implied-consent law, but are only given to show that an implied-consent violation (when a person is also guilty of DUI) is not nearly as much of an assault on the public good as some other offenses. This is the essence of the excessive and proportional punishment clauses of the United States Constitution.

43. As mentioned earlier, the Plaintiff takes no position on whether the act of driving a motor vehicle should be considered a "right" or a "privilege". However, the Plaintiff would most vigorously contend that it is not a "mere privilege", in that it is not something that can be taken away at the "whim" of the state. Certainly <u>Mackey v. Montrym</u>, 443 U.S. 1 (1979) shows that a drivers license is a valuable possession, and is something



that can not be taken away without the due process of law. Furthermore, the Plaintiff

contends that the act of driving a motor vehicle is in actuality much more. Driving is, at

its essence, is an expression of an individual's fundamental right to travel, as expressed

in Kent v. Dulles, 357 U.S. 116 (1958).

44. This is not to say that driving can not be regulated. It can. However, such

regulations must be directly correlated to the overriding state interest in keeping its

roads and highways safe. Therefore, while a criminal punishment may include a license

suspension for a variety of crimes, an administrative regulatory body may only suspend

a person's license for the sole purpose of keeping unsafe drivers off the road. Any

administrative license suspension that can be fairly said to keep reformed, and therefore

safe, drivers off the road, is excessive.

45. As we mentioned earlier, a person guilty of DUI has necessarily been given a set of

requirements to prove that they have reformed, and that they are likely to be safe

drivers who are unlikely to recidivate. The Plaintiff went to jail, attended the Multiple

Offender Program, completed all of its aftercare requirements of AA and alcohol

counseling. In addition, the Plaintiff has already served a three-year license loss for

DUI, and has paid substantial monies in court fines and penalties. The Plaintiff's

alcohol counselor has found that he is reformed, unlikely to recidivate, and ready to be a

safe driver again. This finding is necessary for a person to complete the Multiple

Offender Program, and therefore to be eligible for license restoration (See NH RSA

265:82-d). To impose a further two-year implied-consent license suspension now, is an

excessive penalty that violates the Plaintiff's expression of his fundamental right to travel.

46. In conclusion, NH RSA 265:92 II transforms an implied-consent license suspension into an unconstitutionally excessive penalty, especially when the individual has already served a license suspension for the underlying DUI conduct.

## Due Process And Standard of Proof:

47. The US Constitution directly holds that an individual may not be subject to criminal punishment, unless they are found to be guilty by proof which is "beyond a reasonable doubt". The Plaintiff has demonstrated that the implied-consent suspension of NH RSA 265:92 II is in "form and effect" criminal punishment. The Plaintiff has shown that any administrative license suspension that does not have the primary purpose of keeping unsafe and irresponsible drivers off the highway *as quickly as possible*, is an infringement of the "right to travel", and therefore is criminal punishment. Therefore, all persons who are subject to a non-concurrent license suspension are constitutionality entitled to be convicted of a crime "beyond a reasonable doubt".

48. In reality however, the statutory scheme is such that in "form and effect" a person in the Plaintiff's position, is really guilty of an "enhanced" DUI conviction. In the case of a 2nd DUI Offense, the person is subjected to a 5-year loss of license, instead of the three-year maximum license suspension as stipulated in NH RSA 265:82-b. However, the "enhancing" factor of the implied-consent violation, is not proved "beyond a reasonable doubt", but only on a "preponderance of the evidence." This is clearly unconstitutional,

as the fairly recent Supreme Court case of <u>Apprendi v. New Jersey</u> (99-478) 530 U.S.
466 (2000) demonstrates.

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime
> beyond the prescribed statutory maximum must be submitted to a jury, and proved
> beyond a reasonable doubt.
>
> (<u>Apprendi v. New Jersey</u> (99-478) 530 U.S. 466 (2000))

It should be noted that a fair reading of Apprendi would limit the "prior conviction"

exception to a prior criminal conviction.  It would certainly violate the principles of

Apprendi, if New Jersey were to adopt an outside civil hearing to determine if his

conduct (whether criminal or not) was motivated by racial intimidation. If New Jersey

then tried him for the second-degree firearm possession charge (that carried a

maximum term of 10 years in prison), but sentenced him to the 12-year prison term,

based on the outside civil hearing determination, this would still violate the Supreme

Court's decision that the enhancing factor needs to be proved "beyond a reasonable

doubt."

49. Even if two proceedings are considered separate, the necessity for a finding

"beyond a reasonable doubt" is boilerplate in nature, and is firmly entrenched in our

federal legal tradition.  Therefore, if non-remedial license suspensions are protected

under a "enhanced" DUI scenario under Apprendi, they should most assuredly be

protected in a separate "quasi-criminal" proceeding (See <u>Plymouth Sedan v.

Pennsylvania</u>, 380 U.S. 693 (1965)).

### **RELIEF SOUGHT**

The Plaintiff seeks relief by any, or all of the following:

29

1) Either;

    a) Declare New Hampshire's non-concurrent implied-consent penalty (under NH RSA 265:92 II, and other related NH statutes) as unconstitutional on its face.

  or;

    b) Declare that the Defendant has unconstitutionally applied the non-concurrent implied-consent penalty to individuals (such as the Plaintiff), who have already served a DUI license suspension for the same underlying offense.

2) Declare that related administrative rules (under NH Saf-C) are unconstitutional on their face, and/or that they are unconstitutionally applied to individuals (such as the Plaintiff), who have already served a DUI license suspension for the same underlying offense.

3) Either;

    a) Order the Defendant to impose the two-year implied-consent license suspension from the either: the date of the offense, the date of the implied-consent hearing, or from the date of the DUI conviction.

  or;

    b) Order the Defendant to dismiss the implied-consent finding in the case, in light of the Plaintiff's later DUI guilty plea, because the nature of the penalty is that is must be non-concurrent. Therefore, the penalty should not be applied to the Plaintiff, or towards any similarly situated individual.

4) Order that the Defendant restore the Plaintiff's New Hampshire drivers license immediately, subject to the payment of appropriate administrative fees and the demonstration of proof of financial responsibility (SR-22).

5) Order that the Defendant pay pecuniary compensatory damages to the Plaintiff in the amount of $40 per day, for each day the Plaintiff has been injured by this unconstitutional penalty (each day since 5/30/2003). The purpose of these damages would be to compensate the Plaintiff for lost earnings potential, and for the increased cost in transportation. The Plaintiff would request a hearing to produce evidence of lost earnings potential and the increased cost of transportation.

6) Order that the Defendant pay non-pecuniary compensatory damages to the Plaintiff in the amount of $100 per day, for each day the Plaintiff has been injured by this unconstitutional penalty (each day since 5/30/2003). The

purpose of these damages would be to compensate the Plaintiff for intangible injuries (such as quality of life). A hearing in regards to these damages would also be requested.

7) Order the Defendant to pay Court costs to the Defendant, for out of pocket legal expenses related to this case since 5/30/2003. A hearing, to produce evidence of Court filing fees, copying fees, and other related expenses, would be requested.

8) Order any other relief that this Court deems appropriate.

Respectfully submitted,

David A. Perry, (pro se)
53 Delaware Ave
Manchester, NH 03104
(603) 682-7832

## CERTIFICATION

I certify that a copy of the foregoing Complaint was delivered to the New

Hampshire Division of Motor Vehicles on _____ 2 | 4 | 2004 _____

David A. Perry, (pro se)
53 Delaware Ave
Manchester, NH 03104
(603) 682-7832

31